| **Bivona v Gupta** |
|:---:|
| 2025 NY Slip Op 31270(U) |
| April 11, 2025 |
| Supreme Court, New York County |
| Docket Number: Index No. 452939/2021 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. JOHN J. KELLEY**

*Justice*

--------------------------------------------------------------------------------X

ANTHONY G. BIVONA,

Plaintiff,

- v -

NICKHIL GUPTA, D.O., and NICKHIL GUPTA, D.O., P.C.,

Defendants.

--------------------------------------------------------------------------------X

| | |
|---|---|
| PART | 56M |
| INDEX NO. | 452939/2021 |
| MOTION DATE | 01/27/2025 |
| MOTION SEQ. NO. | 001 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71

were read on this motion to/for _____JUDGMENT - SUMMARY_____.

In this action to recover damages for medical malpractice based on alleged departures from good and accepted practice, lack of informed consent, and negligent hiring, the defendants move pursuant to CPLR 3212 for summary judgment dismissing the complaint. The plaintiff opposes the motion. The motion is granted to the extent that the defendants are awarded summary judgment dismissing the negligent hiring cause of action, and so much of the medical malpractice cause of action as was premised upon the plaintiff's claims that the epidural injections that are the subject of this action were contraindicated and that he sustained demyelination or transverse myelitis as a consequence of the injections, as well as upon alleged departures from good and accepted practice in the actual treatment of the plaintiff on dates other than May 26, 2017. The motion is otherwise denied, since there are triable issues of fact as to (a) whether the defendant Nickhil Gupta, D.O., departed from good and accepted practice in administering an epidural injection to the plaintiff on May 26, 2017, in failing to diagnose the plaintiff with a lesion at the C6/7 level of his cervical spine subsequent to the injection, and in failing to develop an appropriate post-injection treatment protocol, (b) whether Gupta obtained

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.         Page 1 of 32
Motion No.  001

1 of 32

the plaintiff's fully informed consent to that injection procedure, (c) whether these alleged wrongful acts and omissions caused or contributed to the plaintiff's claimed injuries, and (d) whether Gupta's professional corporation, the defendant Nikhil Gupta, D.O., P.C. (hereinafter the corporation), may be held vicariously liable therefor.

The crux of the plaintiff's claim is that, on April 28, 2017, Gupta negligently administered a transforaminal lumbar epidural steroid injection (TFESI) to the L4-L5 and L5-S1 levels of his spine, and that, on May 26, 2017, Gupta negligently administered a interlaminar cervical epidural steroid injection (CESI) to the C6-C7 level of his spine. The plaintiff alleged that, as a consequence of that malpractice, he developed a cervical lesion and paresthesia in his lower extremities, ultimately necessitating a discectomy.

In his complaint, the plaintiff alleged that the defendants departed from good and accepted practice in failing promptly and properly to diagnose his condition and in failing to order proper tests and procedures. He further averred that the defendants negligently performed the spinal injections, causing him to sustain a cervical lesion, which he alleged they failed timely to diagnose. More specifically, he contended that the defendants failed properly to position him during the epidural spinal injections, and negligently allowed him to remain in a dangerous bodily position. The plaintiff additionally asserted that they departed from accepted practice by placing him under general anesthesia, rather than keeping him awake during the injection procedures, and failed to consider employing anesthetics other than the one that they employed. Moreover, he claimed that the defendants failed timely or appropriately to respond to his post-procedure complaints, failed to administer appropriate pain medications and antibiotics, and failed timely to alleviate the pressure on his spinal cord, inasmuch as they delayed his opportunity to undergo surgery to address his pain. In this respect, the plaintiff asserted that the defendants negligently failed to obtain a consultation with a surgeon or neurosurgeon, and failed to refer him to a hospital for immediate surgery. The plaintiff further alleged that the epidural injections constituted contraindicated procedures. Moreover, he contended that the defendants

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**          **Page 2 of 32**
  **Motion No.  001**

2 of 32

[* 2]

and their staff did not obtain his fully informed consent to the injections, and did not adequately communicate with him as to his postoperative symptoms.

The plaintiff alleged in the complaint that the malpractice occurred between November 8, 2016, when he first presented to the defendants, through May 26, 2017. In his bill of particulars, although he alleged that the malpractice occurred between November 8, 2015 and May 26, 2016, the court concludes that this was a typographical error, in light of the examination and treatment dates set forth in the defendants' chart. In any event, in his bill of particulars, the plaintiff essentially reiterated the allegations set forth in his complaint, and included allegations that the defendants negligently failed to provide postoperative remedial treatment.

In his bill of particulars, the plaintiff averred that, as a consequence of the defendants' allegedly wrongful acts, he was required to undergo anterior cervical discectomies at the C6-7 and C5-6 levels of his spine, with an osteophytectomy at both of those levels, as well bone harvesting with cage arthrodesis, fusion, and plating, along with arthroplasty at the C5-6 and C6-7 levels of his spine. The plaintiff further alleged the defendants' malpractice caused him to sustain myelomalacia of the cervical spine, cervical right paracentral and central herniation at the C3-C4 and C4-C5 levels with thecal sac indentation and anterior thecal sac flattening, cervical central herniation at the C5-C6 level with thecal sac indentation and impingement upon originating C7 roots, C6-C7 level spondylosis with disc bulging, central canal stenosis, bilateral foraminal stenosis, and the displacement of cervical intervertebral discs. He asserted that a hyperintense lesion appeared on a T-2 weighted image of the C6-C7 level of his spine, reflecting a cystic midline myelomalacia lesion and cord contusion at that level, which was the location at which he had been administered the second of the two epidural steroidal injections that are the subject of this action. In addition, he contended that the defendants' wrongful acts and omissions caused him to sustain bulging discs at the L3-L4 and L5-S1 levels of his spine and a herniation and broad disc bulging at the L4-L5 level, with impingement upon the exiting L4 disc, root central canal stenosis, and bilateral foraminal stenosis. The plaintiff further asserted

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.        Page 3 of 32
Motion No. 001

3 of 32

that he suffered from bulging discs at the T1-T2, T3-T4, and T6-T7 levels of his spine, and a three-millimeter (mm) long central disc herniation, with anterior thecal sac flattening at the T7-T8 level. Additionally, the plaintiff averred that, a consequence of the defendants' negligence, he suffered from spinothalamic tract dysfunction paresthesia, affecting both his upper and lower extremities and genitalia, as well as cervical radiculopathy, traverse myelitis, and demyelination of his spinal cord, along with left shoulder tendinosis of the anterior fibers of the supraspinatus and subacromial/subdeltoid bursitis. The plaintiff claimed that all of these conditions caused him to experience numbness in his chest, lower extremities, feet, upper extremities, right arm, groin, testicles, penis, rectum, perineum, and buttocks, as well as numbness upon bowel movements and urination. He claimed also to have suffered from swelling, weakness, and tingling in those parts of his body, leading to impairment of his balance and mobility. The plaintiff further claimed to have suffered from sexual dysfunction and impaired erectile function as a result of these conditions, as well as anxiety and loss of enjoyment of life.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp.*, 18 NY3d at 503). A movant's failure to make a prima facie

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.            Page 4 of 32
Motion No.  001

4 of 32

showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr*., 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble,* 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]). Such a cause of action may be premised upon a claim that those departures allowed a patient's condition to worsen, and thus deprived him or her of an opportunity for a cure or a better outcome (*see Mortensen v Memorial Hosp*., 105 AD2d 151, 156, 159 [1st Dept 1984]; *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, 178 [1st Dept 1974], *affd no op.* 37 NY2d 719 [1975]). Moreover, where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and the insufficiency of or delay in treatment proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Perez v Fitzgerald,* 115 AD3d 177, 178 [1st Dept 2014]; *Perlin v King*, 36 AD3d 495, 495 [1st Dept 2007]; *see generally Zabary v North Shore Hosp. in Plainview,* 190

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.   Page 5 of 32
Motion No.  001

5 of 32

AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017];

*Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege

medical malpractice for failure to diagnose a condition . . . pertain to the level or standard of

care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia

Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

To make a prima facie showing of entitlement to judgment as a matter of law, a

defendant physician moving for summary judgment must establish the absence of a triable

issue of fact as to his or her alleged departure from accepted standards of medical practice

(*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept

2019]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24) or establish that the plaintiff was not injured

by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v

Centereach Mgt. Group, Inc.*, 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d

Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]). To satisfy this

burden, a defendant must present expert opinion testimony that is supported by the facts in the

record, addresses the essential allegations in the complaint or the bill of particulars, and is

detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v

Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009];

*Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]). If the expert's opinion is not based on facts

in the record, the facts must be personally known to the expert and, in any event, the opinion of

a defendant's expert should specify "in what way" the patient's treatment was proper and

"elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept

2010]). Stated another way, the defendant's expert's opinion must "explain 'what defendant did

and why'" (*id.*, quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]). Moreover,

as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must

address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**          **Page 6 of 32**
**Motion No.  001**

6 of 32

[* 6]

(*see Wall v Flushing Hosp. Med. Ctr.*, 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]). Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325 [emphasis added]; *see also Pancila v Romanzi,* 140 AD3d 516, 516 [1st Dept 2016]; *Callistro ex rel. Rivera v Bebbington*, 94 AD3d 408, 410 [1st Dept 2012], *affd sub nom. Callistro v Bebbington*, 20 NY3d 945 [2012]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

In support of their motion, the defendants submitted the pleadings, the plaintiff's bills of particulars, transcripts of the parties' deposition testimony, relevant medical and surgical records, a statement of allegedly undisputed material facts, a memorandum of law, an attorney's affirmation, and the expert affirmations of board-certified anesthesiologist and pain medicine specialist Christopher Gharibo, M.D., and internist and board-certified neurologist David Myland Kaufman, M.D.

Dr. Gharibo opined that the defendants did not depart from good and accepted medical practice in their examination, diagnosis, treatment of, and post-injection care rendered to, the

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.** **Page 7 of 32**
**Motion No. 001**

7 of 32

[* 7]

plaintiff, that the lumbar and cervical epidural steroid injections were indicated, and that nothing that the defendants did or did not do caused or contributed to the plaintiff's injuries.

Initially, Dr. Gharibo provided a narrative history of the plaintiff's condition prior to presenting to the defendants on November 8, 2016. According to his review of relevant medical records and deposition testimony, Dr. Gharibo asserted that the plaintiff sustained neck, back, and shoulder injuries in a November 4, 2016 motor vehicle accident, and noted that the plaintiff had testified at his deposition that he earlier had sustained injuries to his neck and back in at least five motor vehicle accidents prior to November 2016, as well as a work-related accident that occurred in approximately 1996.

Dr, Gharibo noted that, on December 5, 2016, and, thus, approximately one month after the November 4, 2016 accident, the plaintiff began treatment with chiropractor Richard Amato, D.C., and licensed acupuncturist Christos Tserotas at Village Physical Therapy, Chiropractic & Acupuncture, P.C., in Rego Park, New York, where he was examined and treated with acupuncture on nine occasions through April 24, 2017. Dr. Amato referred the plaintiff to physiatrist and pain management specialist Gupta and Gupta's corporation.

The plaintiff first presented to Gupta on December 5, 2016, the same day that he began treating with Dr. Amato, complaining of neck pain and stiffness that radiated bilaterally to his shoulders, and lower back pain and stiffness that was "non radiating" bilaterally to his shoulders. According to Gupta's chart, the plaintiff characterized his neck and lower back pain as a 5 on a scale of 10, while he reported his shoulder pain as 8 out of 10, and that the plaintiff reported that his pain was exacerbated by descending stairs, lifting any object, carrying heavy objects, climbing stairs, prolonged sitting, getting up from a sitting position, bending down, prolonged standing, walking, laying down, pulling, extremes of range of motion, and weather change. As Dr. Gharibo interpreted the plaintiff's medical records, the plaintiff underwent magnetic resonance imaging (MRI) scans on January 26, 2017, which Dr. Gharibo asserted revealed that the plaintiff then was suffering from the following conditions:

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.        Page 8 of 32
Motion No.  001

8 of 32

"paracentral herniation at C3-4 with thecal sac indentations; right paracentral herniation at C4-5 with thecal sac indentation; broad central herniation at C5-6 with thecal sac indentation and impingement upon originating C7 roots; mild bilateral bony foraminal stenosis secondary to uncovertebral and facet joint hypertrophy; central and right paracentral herniation at C6-7 with impingement upon the cord and right C8 root; mild bilateral bony foraminal stenosis; and right foraminal herniation at C7-T1 with impingement upon the exiting C8 root. In the lumbar spine: bulging disc at L3-4 without stenosis; right foraminal herniation at L4-5 with impingement upon the exiting L4 roots; circumferential disc bulge at L5-S1 with mild bilateral foraminal stenosis and with impingement upon the exiting L5 roots; a superimposed central herniation with impingement upon the thecal sac and originating S1 roots; and apparent end stage cystic left kidney."

The plaintiff next saw Gupta on April 24, 2017, at which time Gupta diagnosed the plaintiff with intervertebral disc disorders, acute cervical strain/sprain, acute lumbosacral strain/sprain, backache, unspecified, cervical disc bulge, cervicalgia, degeneration of cervical intervertebral disc, degeneration of intervertebral disc (site unspecified), discogenic back pain, displacement of cervical disc, displacement of cervical intervertebral disc without myelopathy, displacement of lumbar disc, lumbago, lumbar disc bulge, lumbar intervertebral disc without myelopathy, lumbar nerve root compression, lumbar or lumbosacral intervertebral disc, muscle spasm, neuralgia. neuritis, and radiculitis (unspecified), other and unspecified disc disorder, calcification of intervertebral cartilage or disc, discitis (other), unspecified disorders of back, other symptoms referable to the back, other unspecified back disorders, paresthesia/sensory loss, radiculitis due to intervertebral disc involvement, sciatica, thoracic or lumbosacral neuritis or radiculitis (unspecified), and below-the-shoulder derangement. Gupta formulated a plan to administer cervical epidural steroid injections (CESI) to the plaintiff's back as soon as possible.

Nonetheless, on April 28, 2017, when Gupta again examined and evaluated the plaintiff, he determined that a transforaminal lumbar epidural steroid injection (TFESI) should be administered immediately to the L4-L5 and L5-S1 levels of the plaintiff's spine. Gupta administered the TFESI that day. In his operative report, which for some reason was dated April 27, 2017, Gupta wrote the following:

"the patient was escorted to the operating room and placed in the prone position on the operating table with a pillow underneath the abdomen to reduce the

452939/2021  BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.        Page 9 of 32
Motion No. 001

9 of 32

lumbar lordotic curvature. Thereafter, using oblique fluoroscopic imaging, the skin overlying the B/L L5/S1 foramens were identified and marked. The skin was then draped and prepared in a typical sterile fashion, then infiltrated with 1% lidocaine to achieve adequate skin analgesia. Thereafter, 22-gauge, 5-inch spinal needles were advanced under intermittent oblique fluoroscopic imaging to each of the B/L L5/S1 foramens. Correct needle tip placement was verified using AP and lateral fluoroscopic imaging."

The operative report further stated that,

"[u]pon final needle placement, the needles were aspirated and found to be negative for heme or CSF, and then injected with 1 to 2 mL of Omnipaque 300 under intermittent and live fluoroscopic imaging, demonstrating good epidural and perineural spread with no vascular uptake noted. Thereafter, injectate consisting of 12 mg of betamethasone and 4cc's 0.25% bupivacaine was injected in total amongst all injection sites. Each needle was then flushed; withdrawn and sterile dressing was applied. The patient remained hemodynamically stable throughout the procedure with no complications noted. The patient was taken in stable condition to the postoperative recovery area."

When the plaintiff returned to see Gupta on May 26, 2017, Gupta finally performed a

CESI procedure. In his operative report referable to that procedure, he wrote that,

"the patient was escorted to the operating room and placed in the prone position on the operating table with a pillow underneath the forehead and the head correctly positioned to reduce the cervical lordotic curvature. A timeout was performed including correct patient, correct procedure and correct laterality. I was wearing a hat, mask, and sterile gloves throughout the entire procedure. The operative site was prepped with chlorhexidine solution and subsequently draped with a sterile OR towels.

"Using AP fluoroscopic imaging, the skin overlying the C6/7 interspace was identified and marked. The skin was then draped and prepared in a typical sterile fashion and infiltrated with 1% lidocaine to achieve adequate skin analgesia. Thereafter, under AP fluoroscopic imaging using loss of resistance to saline technique an 18-gauge, 3-1/2-inch Tuohy needle was introduced and advanced into the C6/7 epidural interspace. Once loss of resistance was obtained, the needle was aspirated and found to be negative for heme or CSF. Approximately 2 mL of Omnipaque 300 was injected, demonstrating good epidural and perineural spread with no vascular uptake noted. Thereafter, injectate consisting of 12 mg of betamethsone with 3 mL of preservative-free normal saline was injected. The needle was then flushed and withdrawn. Sterile dressing was applied.

"The patient tolerated the procedure well and remained hemodynamically stable throughout the procedure with no complications noted. The patient awoke without pain or complication and was given discharge instructions prior to discharge home in stable condition. Motor and sensory function was intact at discharge from P[ost] A[nesthesia] C[are] U[nit]. He will follow up in one weeks' time for post-operative follow up."

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.** **Page 10 of 32**
**Motion No. 001**

[* 10]

10 of 32

In a follow-up pain management consultation form, dated May 27, 2017, Gupta formulated a plan to schedule the plaintiff for a second TFESI, which was to be administered bilaterally to the L4-L5 and L5-S1 levels of the spine, under fluoroscopic guidance, but made no mention that he had administered a CESI on May 26, 2017, let alone what the outcome of that injection was.

On May 30, 2017, the plaintiff underwent an MRI scan of his thoracic spine at St. Francis Hospital in Roslyn, New York, which, according to Dr. Gharibo, revealed no evidence of thoracic cord compression, although it did reflect the presence of disc bulging at the T1-T2, T3-T4, and T6-T7 levels of the plaintiff's spine, as well as a 3 mm central disc herniation, with anterior thecal sac flattening, at the T7-T8 level.

Dr. Ghabiro explained that an epidural steroid injection is an injection of corticosteroids, a type of anti-inflammatory medication, into the epidural space. He stated that a transforaminal injection such as a TFESI involves an injection from the side, and into the neuroforamen, where the nerve exits the spine. Dr. Ghabiro asserted that epidural steroid injections are utilized to reduce inflammation around nerves and the epidural space by flushing away the inflammatory mediators and by neutralizing the chemical process that causes inflammation and swelling.

Dr. Ghabiro opined that the Gupta properly considered the plaintiff's medical history and clinical condition, properly concluded that plaintiff otherwise was healthy and relatively young, and appropriately determined that the plaintiff was seeking pain relief after trying multiple conservative treatments, with only minimal success. He asserted that Gupta properly screened the plaintiff for proceeding with epidural injections. After explaining in detail the nature of the various back, spinal cord, and disc conditions with which the plaintiff had been diagnosed after the January 26, 2017 MRI scan, Dr. Gharibo opined that, in light of the plaintiff's extensive spinal disease, which included

> "disc herniations and bulges with impingement, thecal sac indentations, foraminal stenosis, and facet joint hypertrophy---in the cervical, thoracic and lumbar spine---all causing plaintiff multiple symptoms including pain, weakness, and numbness and tingling of the extremities,"

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.          Page 11 of 32
Motion No.  001

pain management injections were indicated and necessary.

Dr. Gharibo additionally gave his opinion that Gupta's employment of live fluoroscopy imaging guidance to ensure that needles were placed properly throughout the procedures, and his technique in employing that imaging tool, were proper and within the standard of care, as was his administration of Omnipaque dye and the steroid betamethasone. He further explained that Gupta also performed an epidurogram to examine the spread pattern and flow of contrast dye in the epidural space around the nerves, which can show the outline of the nerves, and can confirm needle placement. Dr. Gharibo thus concluded that,

> "Gupta's technique and performance of the May 26, 2017 injection, including the placement of the needles, medications used, fluoroscopy imaging guidance, use of sedation, and epidurogram, w[ere] proper and within the standard of care. With the assistance of the fluoroscopy guidance imaging and epidurogram, based on the images in the records and Dr. Gupta's description of the imaging and procedure, the needles placed by Dr. Gupta were placed properly and within the standard of care."

> " . . . Dr. Gupta's operative reports and fluoroscopy imaging provide standard of care detail regarding the placement of the needles during both procedures. Based on my review of the records and images pertaining to the April 28, 2017 and May 26, 2017 injection procedures, there was proper needle placement during both procedures."

Dr. Gharibo further opined that Gupta's use of monitored anesthesia care and his interactions with an anesthesiologist during the CESI and TFESI procedures satisfied the applicable standard of care, inasmuch as Gupta properly proceeded with the injection procedure after the patient was appropriately sedated. Additionally, he noted that, when a patient complains of pain after an injection procedure, such a complaint can arise from numerous things, including patient position, anxiety, the patient's underlying condition, or the procedure itself, and that Gupta, during the injection procedures, employed objective methods to confirm that the needles were in the correct place, including fluoroscopy guided video imaging throughout the procedures, "loss of resistance" technique, and the monitoring of the patient's vital signs and breathing. As Dr. Gharibo explained it, "[w]ith these objective aides [sic], he knows he did not touch the nerve

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**          **Page 12 of 32**
**Motion No.  001**

because prior to loss of resistance, he is nowhere near the spinal canal." Dr. Gharibo stated that, based on his review of Gupta's deposition testimony and operative reports, Gupta employed fluoroscopic imaging guidance, a special syringe filled with saline solution, and the loss-of-resistance technique to ascertain that he was in the proper anatomical region when placing the needle in the epidural space, as well as the injection of contrast dye is to confirm proper needle placement, all monitored with image guidance. He thus concluded that Gupta performed the CESI and TFESI procedures with the applicable standard of care.

With respect to the May 26, 2017 CESI procedure at Oradell Surgery Center in Oradell, New Jersey, Dr. Gharibo accepted Gupta's testimony that Gupta, along with a nurse and an x-ray technician, placed the plaintiff in a prone position, with his head flexed forward on a table that held the plaintiff in that position, but allowed Gupta to adjust the head position if necessary, while Gupta employed a strap around the plaintiff's abdomen or buttocks to maintain the plaintiff on the table. He further relied on Gupta's testimony that the injection procedures took about 10 to 20 minutes, and agreed with Gupta that the goal was to inject steroids into the epidural space for maximum benefit, as the affected nerve roots and subject herniation were located in that space. As he explained it,

> "[s]teroid is used to reduce the inflammation. Dr. Gupta used an 18-gauge Tuohy needle which is a spinal needle used to perform interlaminar injections. It is a 3.5 inch needle. He injected the C6-C7 interspace. . . . [T]his was the correct and typical position for the cervical epidural steroid injection. . . .Gupta used the correct size needle and based on the fluoroscopy imaging, loss of resistance technique, the needles were in the correct area of the epidural space and the medications were properly injected to provide plaintiff the epidural pain relief. In addition, the timing of the procedure was typical and appropriate and within the standard of care."

Dr. Gharibo asserted that all of the complaints lodged by the plaintiff in the post-anesthesia care unit after the May 26, 2017 CESI procedure described discomfort and numbness that were normal for such a patient. Although he acknowledged that a cervical spine MRI scan taken only four days later at St. Francis Hospital revealed a cord lesion at the C6-C7 level of the plaintiff's spine, he nonetheless asserted that,

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.        Page 13 of 32
Motion No.  001

13 of 32

[* 13]

"[i]f Dr. Gupta somehow damaged or touched the C6-7 cord with his needle during the injection, thereby allegedly causing a cord lesion or contusion, that may be a recognized complication of the injection without any malpractice. However, in my opinion, Dr. Gupta did not touch or damage the spinal cord during his injections. Significantly, if Dr. Gupta touched or damaged the spinal cord on May 26, 2017 with the needle, then plaintiff would have had progressive and much more significant complaints immediately after the injection and plaintiff would not have been able to walk out of the procedure and go home and stay home for 5 days thereafter without seeking medical attention or going to a hospital or emergency room or urgent care doctor."

Dr. Gharibo further opined that, had Gupta damaged, punctured, or injected steroids into the cord, there would be a cord expansion, in which the cord would become swollen or inflamed and expand, or a "syrinx" would form. He explained that, inasmuch as there was no such cord expansion described on the MRI reports after May 26, 2017, as well as no needle track, no inflammation, no syrinx, and no evidence that the needle penetrated the cord, he had to conclude that Gupta did not damage, puncture, or inject steroids into the cord itself.

Consequently, Dr. Gharibo asserted that the post-injection neuropraxia and numbness that the plaintiff experienced on May 26, 2017 had nothing to do with the cord lesion that was observed on the May 30, 2017 MRI scan. In this respect, he opined that physical damage to the spinal cord causes acute inflammation, numbness, weakness, and pain that sometimes gets better, and sometimes can be permanent, and that the plaintiff's spinal cord did not reveal atrophy on subsequent MRIs, which would have been a sign of severe and permanent damage. Dr. Gharibo ascribed the plaintiff's cord lesion to the progression of an underlying disease, along with everyday constrictive movements about the cervical spine, such as simple neck extensions, and stated that myelomalacia, that is, the softening of the spinal cord, can also be due to significant cervical stenosis, particularly where the cervical region of the spine is excessively tight. He concluded that there was no basis or evidence in the records or testimony to support the plaintiff's allegation that the April 28, 2017 or May 26, 2017 procedures caused, contributed to, or aggravated the cervical cord lesion.

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.** **Page 14 of 32**
**Motion No. 001**

14 of 32

Dr. Kaufman, an internist and neurologist, opined that, from a neurological standpoint, the care and treatment that the defendants rendered to the plaintiff was within the standard of care, and that no acts or alleged omissions by the defendants caused or contributed to any of the plaintiff's claimed injuries. With respect to this latter opinion, Dr. Kaufman concluded that the conditions complained of by the plaintiff were not causally related to the C6-C7 spinal cord contusion that he allegedly suffered at the time of Gupta's administration of the injection on May 26, 2017 because the plaintiff's subsequent neurological examinations results "were negative and/or normal and did not correlate with the symptoms plaintiff claims to have."

Dr. Kaufman contended that the plaintiff's complaints and alleged symptoms of sensory loss subsequent to Gupta's May 26, 2017 administration of a cervical epidural steroid were "entirely subjective," and were contradicted by multiple normal physical, neurological, sensory, and motor skill examinations performed by various physicians who evaluated him, including neurologists at St. Francis Hospital on May 30, 2017, and neurologists Laurence Haber, M.D., on June 5, 2017, Jonathan M. Goldstein, M.D., on July 5, 2017 and August 4, 2017, Itzhak C. Haimovic, M.D., on November 21, 2017, and Nimalya Ganeshalingam, M.D., on January 29, 2018. As Dr. Kaufman explained it, none of the multiple medical providers who examined the plaintiff was "able to confirm objectively the plaintiff's subjective complaints and alleged symptoms of sensory loss." Dr. Kaufman described the nature and extent of the examinations and testing performed by each one of those examining physicians, and reported that Dr. Ganeshalingam's chart for January 29 , 2018 indicated that "the examination findings on the sensory examination did not correlate with the dermatomal distribution that the patient described in the history of presenting illness," which, according to Dr. Kaufman, confirmed that the plaintiff's alleged symptoms of sensory loss "were never found or confirmed on sensory and other neurological examinations."

In addition, Dr. Kaufman asserted that the plaintiff's electromyography (EMG) and somatosensory evoked potential (SSEP) tests, which he characterized as objective, sensitive,

neurophysiologic studies performed to evaluate a patient for nerve and muscle damage, were all normal. He specifically referred to the plaintiff's August 24, 2017 EMG and nerve conduction velocity (NCV) studies performed at the Hospital for Special Surgery (HSS) in Manhattan. Specifically, Dr. Kaufman asserted that bilateral peroneal and tibia motor studies were normal, as were bilateral sural, superficial peroneal, lateral, and medial plantar sensory studies, with no spontaneous activity, and that "normal recruitment" was noted in all of the muscles that had been tested. Hence, he asserted that the examining physician formed an impression of "no electrodiagnostic evidence for a neuropathy or lumbar radiculopathy," which Dr. Kaufman characterized as inconsistent with the plaintiff's alleged complaints and purported loss of sensation. He also referenced the plaintiff's December 12, 2017 SSEP test, which yielded normal results as to the levels of conduction through the plaintiff's spinal cord pathways.

As Dr. Kaufman explained it, when spinal cord damage causes sensory loss, it typically is accompanied by motor loss symptoms, such as weakness, abnormal deep tendon reflexes, and the presence of Babinski signs, which he described as a reaction elicited by the stimulation of the lateral plantar aspect of the foot, consisting of extension of the great toe and, frequently, fanning of the other toes, which signs are indicative of corticospinal tract dysfunction. He concluded that, inasmuch as such finding constituted "objective abnormalities," while the plaintiff's examining neurologists did not find any such abnormalities, the plaintiff thus did not present to those neurologists with any objective conditions. Moreover, Dr. Kaufman noted that the plaintiff was able to return to work approximately six months after the May 26, 2017 injection, and that the plaintiff had testified that, while at work, he was able to pull a cart that he used for testing samples at a sewage treatment plant, to ride a bicycle, and to walk around the 65-acre plant. He opined that, if the plaintiff had sustained a spinal cord injury, the plaintiff would not have been able to resume his work activities within six months.

Dr. Kaufman averred that, even if the plaintiff had experienced some numbness and sensory loss, specifically in his feet and lower back, those symptoms would be attributable to his

pre-existing spine disease, which Dr. Kaufman asserted was apparent on the January 26, 2017 MRI studies of the cervical, lumbar, and thoracic spinal regions. He further noted that the plaintiff had sustained multiple disc herniations, bulging discs, stenosis, foraminal stenosis, impingement of the nerves, facet joint hypertrophy, and thecal sac indentations and impingement, as revealed in those scans and the May 30, 2017 MRI scans of his lumbar and thoracic spine. Dr. Kaufman explained that,

> "at the exact level of the spinal cord contusion C6-C7---on the MRI on January 26, 2017 (four months prior to the injection at issue), it was documented that plaintiff had. . . [b]road central herniation at C5-6 with thecal sac indentation and impingement upon originating C7 roots . . . [,] [b]ilateral bony foraminal stenosis secondary to uncovertebral and facet joint hypertrophy . . . [,] [c]entral and right paracentral herniation at C6-7 with impingement upon the cord and right C8 root [,] bilateral bony foraminal stenosis[,] and . . . [r]ight foraminal herniation at C7-T1 with impingement upon the exiting C8 root."

Accordingly, Dr. Kaufman concluded that plaintiff had pre-existing neck and back injuries caused by both the November 4, 2016 motor vehicle accident and a work-related fall in the 1990s. He stated that, after the May 26, 2017 steroid injection, the plaintiff had two other

> "potential neck injuries (fist fight with his brother-in-law in which he hurt his neck---reported on January 29, 2018 to Dr. Haimovic; and on August 23, 2018 plaintiff reported to the New York Presbyterian Queens Hospital Emergency Room for neck pain while he was pulling something at work and felt a 'pop' feeling on the back of his neck and started to feel numb on his left arm)."

Dr. Kaufman opined that these preexisting and "potential" subsequent neck injuries "could cause" the plaintiff's symptoms, including the loss of sensation from the chest or waist down.

Dr. Kaufman concluded that the plaintiff did and does not have a clinical injury related to the cord contusion and that, if there were any type of clinical injury from the C6-C7 cord contusion after the May 26, 2017 cervical injection, any such injury would have healed, was nota permanent injury, and did not cause plaintiff's current complaints of sensory loss.

Dr. Kaufman conceded that, on September 22, 2027, neurosurgeon Ezriel E. Kornel, M.D., performed an anterior cervical discectomy at the C6-C7 and C5-C6 levels of the plaintiff's spine with osteophytectomy at both levels, bone harvesting with cage arthrodesis, fusion, and

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**          **Page 17 of 32**
**Motion No.  001**

17 of 32

[* 17]

plating, and arthroplasty at C5-6 and C6-7. Nonetheless, Dr. Kaufman opined that the cord contusion at the C6-C7 level of the plaintiff's spine was completely unrelated to that procedure. According to Dr. Kaufman, this surgery was not a treatment for cord contusion, and he noted that the plaintiff himself testified that Dr. Kornel had advised that the surgery was not related to the cord contusion. In addition, Dr. Kaufman rejected the plaintiff's claims that he suffered from demyelination and transverse myelitis as a consequence of the injection, asserting that these conditions "were merely part of the May 30, 2017 cervical MRI report's differential diagnosis and plaintiff was later found to have a cord contusion (not demyelination or transverse myelitis)." He further expressly rejected the plaintiff's allegations that his spinal disc herniations, disc bulges, and sequela thereof were caused by any injection. Rather, based on Dr. Kaufman's reading of relevant imaging, he concluded that these conditions are degenerative and were caused by the plaintiff's motor vehicle accidents, work-related accidents, and fist fight, as well as wear and tear and repetitive use over the years due to aging. In this respect, Dr. Kaufman averred that the plaintiff's "natural, mostly age-and work-related degenerative disease process and pre-existing injuries are separate from plaintiff's cord contusion at C6-7---which healed."

In opposition to the defendants' motion, the plaintiff relied on many of the same documents that the defendants submitted. He also submitted an attorney's affirmation, a response to the defendants' statement of undisputed material facts, a counter statement of material facts, a memorandum of law, additional medical records, and the expert affirmations of a pain management specialist, a radiologist, and a neurologist.

The plaintiff's expert pain management specialist/anesthesiologist averred that Gupta departed from good and accepted practice "in administering a Cervical Epidural Steroid Injection while [the plaintiff] was completely sedated to the point of being in a deep sleep." The expert further asserted that "the sensory injury that the plaintiff has sustained was a proximate cause of the needle the defendant utilized during the Cervical Epidural injection contacting the nerves

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**        **Page 18 of 32**
**Motion No.  001**

18 of 32

[* 18]

within the C 6/7 epidural space and the spinal cord at the C 6/7 level." Specifically, the expert

asserted that it was "crucial to the standard of care that the patient not be asleep during the

procedure."

After explaining how a CESI is administered, the plaintiff's pain management expert

asserted that

> "[w]hen performing the CSEI [sic], the first nerves that will be encountered by the needle are in the epidural space. In this particular case, the defendant performed the injection at the C 6/7 level. Accordingly, the C 6/7 epidural space will contain the nerve roots of the C 6/7 nerves. The C 6/7 nerves innervate the shoulders and arms. Beyond the epidural space and only less than a ¼ of an inch away, is the spinal canal that contains the spinal cord. The nerves within the spinal cord, if contacted by the needle, can result in sensory and/or motor deficits. These nerves cannot be seen on a MRI, CT, Epidurogram or Fluorscopy, unless dye is used."

The expert further explained that the nerves are so thin that, if a needle contacts a nerve, there

is no resistance felt by the physician to alert him or her of contact or penetration with that nerve.

The expert thus concluded that, although it was proper for Gupta to employ an epidurogram and

a fluoroscopy during the administration of a CESI, "neither of these devices, nor the select

imaging taken during the procedure can prove that at no point did Dr. Gupta contact the nerves

within the C 6/7 epidural space or the spinal cord." As the expert reiterated, the standard of

care, when performing a CESI—"from the moment the injection begins to the removal of the

needle"---is that the patient must be awake and not be sedated so that the patient is able to

communicate with the doctor in order to report any sensation of pain or shock. The basis that

the expert provided for that conclusion was that, inasmuch as an epidurogram or fluoroscopy

cannot yield the image of nerves, and nerves do not cause resistance, the physician otherwise

"has no way of knowing where the nerves in the epidural space are or how far s/he is from the

cord are as the doctor advances the needle." The pain management expert concluded that, if

the patient is awake, and a nerve is contacted, the patient will feel an electrical sensation, but if

the patient is asleep, he or she will not feel the sensation. According to the expert, the standard

of care requires a physician to inform the patient that, if at any time during the injection

**452939/2021  BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**        **Page 19 of 32**
**Motion No.  001**

19 of 32

procedure, the patient feels an electrical sensation in his or her arms, or anywhere in the body, he or she must immediately tell the physician, since, if the needle makes contact with a nerve in the epidural space or the spinal cord, the patient will experience an electrical shock. The expert further averred that the physician must be provided with this information and response so that he or she can immediately pull the needle out of the patient's back. In this respect, the expert expressly disagreed with Dr. Gharibo's opinion that a patient's intra-operative complaint of electrical shock sensation was unhelpful because it was "subjective." Rather, the expert opined that "an electrical sensation is completely helpful and in fact a *necessary and essential part of the injection*. It is crucial information to have so that the patient does not sustain nerve damage during the injection" (emphasis in original).

The plaintiff's expert pain management specialist also expressly rejected the defendants' contention that an epidural injection of the type administered to the plaintiff is so painful that general anesthesia is warranted, let alone required. Rather, the expert opined that only a local anesthetic such as lidocaine would be necessary, that a patient who evinces anxiety about the injection may be calmed down via appropriate communication skills, and that, if that approach is unsuccessful, the patient should be administered "conscious sedation" that permits him or her to remain awake. The expert noted that there was a sharp dispute between Gupta and the plaintiff as to whether Gupta administered conscious sedation or general anesthesia, with the plaintiff asserting that he was completely unconscious during the procedure.

The plaintiff's pain management expert further asserted that, in connection with the technique that Gupta employed,

> "[w]ith respect to resistance, when passing through the muscle and ligaments resistance will be felt, however, once one passes through the ligament and enters into the epidural space, there is only approximately 3.7 mm to the posterior of the cord. That is approximately 0.15 inches. Less than a ¼ of an inch. Thus, once the resistance is no longer felt, it only takes the advancement of the needle less than a ¼ of an inch to impact the spinal cord. And as stated earlier, contacting a nerve will cause resistance in that nerves are very thin. Therefore, the loss of resistance is not a fail-safe to prevent contact with the

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**          **Page 20 of 32**
**Motion No.  001**

20 of 32

[* 20]

nerves within the epidural space and the spinal cord. What is a fail-safe is keeping the patient awake and able to communicate with you."

The expert also explicitly disagreed with the defendants' experts that a physician may ascertain whether he or she "is in epidural space due to loss of resistance and the use of dye within the epidural space." Rather, the expert opined that this "does not tell the practitioner if the needle has contacted nerves in the epidural space or if the needle has advanced to the cord, prior to the administration of the dye or after the loss of resistance." The expert stated that the loss of resistance only informs a physician that, *at the moment of the injection*, the needle has passed the ligament, but does not alert him or her, either before or after the placement of the needle in the epidural space, "where that needle had precisely been before or after the injection."

The expert pain management physician additionally opined that, although the anesthesiologist who administered sedatives to the plaintiff here may not formally have been under Gupta's "control," the identity of the physician who actually administered the sedative, or who had control over the anesthesiologist, is "moot based upon the defendant's expert opinion" itself. In any event, the expert explained that the standard of care for Gupta, as the physician performing the procedure, required him to communicate with the anesthesiologist as to the level of sedation that he wanted, and that it was "not for the anesthesiologist to decide the level of consciousness that a patient should have when Dr. Gupta is performing a procedure."

With respect to the issue of proximate cause, the plaintiff's expert pain management specialist disagreed with the Dr. Gharibo that numbness in the buttocks and penile area of a male patient is a "common finding" immediately after a nerve injection. Rather, the expert opined that a patient who receives a CESI should not awaken with numbness in his buttocks and penile area, as that "means that the spinal cord was contacted and injured during the injection resulting in nerve damage," and that the ultimate diagnosis of neuropraxia denotes that the patient sustained an injury to the spinal cord during the procedure. As the expert described the plaintiff: "He didn't have neuropraxia before the injection he then awakens with neuropraxia,"

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.          Page 21 of 32
Motion No.  001

21 of 32

[* 21]

and "the imaging before the injection did not demonstrate a lesion/injury to the cord, but following the injection on 5/[26]/17, there is a lesion at C 6/7, the level of the injection."

The expert thus concluded that the CESI proximately caused the plaintiff's lesion and injury, with the T-2 weighted hyperintensity on the MRI scan "demonstrating the injury and the numbness the plaintiff complained of when he awoke, the saddle anesthesia, numbness in his arms, hands, feet, right side, chest, as well as his difficulty feeling when he urinated or had a bowel movement as reported at St. Francis records and subsequent records," since only if the spinal cord and the C6/7 nerve roots in the epidural space had been contacted will a patient awake with or develop such complaints. Moreover, contrary to the opinions rendered by the defendants' experts, the plaintiff's pain management expert asserted that, inasmuch as the nerves of the spinal cord run from the brain to the lower spine, where, as here, the signal is damaged along the cord, "the patient will experience sensory loss and/or motor loss from the damaged area down," which, in this case, included "loss of sensation or motor loss . . . from the C 6/7 level down, from the level of the lesion" and "of the shoulders and arms." In addition, the expert rejected the defendants' experts' conclusion that the lesion, and consequent numbness and loss of sensation, may have been caused by an underlying disease, everyday movements, progression of the underlying condition, stenosis, and the like. The expert pain management specialist explicitly asserted that, inasmuch as a lesion or contusion is defined as damage or injury to the spinal cord, the plaintiff's lesion, and all of the conditions that he complained of, were caused by "the CSEI [sic] of 5/26/17 and was permitted to occur since Dr. Gupta administered the injection while the plaintiff was asleep." In this respect, that expert averred that the mere fact that the plaintiff was able to return to work within six months after the injection was not evidence that he was not injured during the procedure.

The plaintiff's expert radiologist concluded that, upon review of the cervical MRI imaging from the January 26, 2017 scan, there was "no lesion/hyperintensity (injury)," while the May 30, 2017 MRI imaging of the same location at St. Francis Hospital, which provided several views of

452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.          Page 22 of 32
Motion No.  001

22 of 32

the spine, revealed "a lesion/T2 hyperintensity at the C 6/7 level." The radiology expert explained that one of the views, or "sequences," constituted an axial or cross-sectional T-2-weighted sequence at C6/7, which was at the level of the injection. As the expert described it, the T-2-weighted sequence is sensitive to fluid or water content, and that increased fluid or water content appears on the imaging as a bright or white area, known both as a hyperintensity and as a lesion. The expert averred that "[t]he area as seen on the imaging is inflamed/swollen, indicating a trauma/injury" to the C6-C7 area of the spinal cord. The radiologist further explained that, if the spinal cord is contacted, it will react by accumulating fluid at the point of contact that will then appear as a bright area on the T2 weighted sequence, described as a hyperintensity or as "swollen." That bright area, according to the expert, was not seen on the January 26, 2017 cervical MRI scan, but its subsequent presence on the May 30, 2017 scan indicated damage or injury within the spinal cord, along the posterior of the spinal cord, "in direct proximity to the expected course of the needle used in this procedure." The radiologist went on to conclude that, based upon the appearance and the location of the bright signal at the level of the injection, the CESI that Gupta administered on May 26, 2017 was a proximate cause of the new lesion seen on the spinal cord on May 30, 2017. The expert further asserted that,

> "[t]he lack of a visible tract towards this area of injury does not exclude the needle as the cause of the injury to the spinal cord. Due to the thinness of the needle, there is rarely if ever, signs of tracking to the cord. Moreover, if the needle did create a tract, it would have been very slight and would have filled in with tissue within the five days prior to the imaging."

The plaintiff's expert neurologist concluded that Gupta departed from good and accepted practice in formulating a post-procedure diagnostic and treatment plan. This expert noted that Gupta's medical chart indicated that, upon awakening from the May 26, 2017 CESI procedure, the plaintiff complained of numbness in the buttocks and penile areas, and that, on May 30, 2017, when he presented to St. Francis Hospital, he continued to complain of that condition, as well as numbness in other parts of his anatomy. The neurologist recounted the findings of the May 30, 2017 MRI, as described above, and, as did the plaintiff's expert radiologist, noted that

452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.
Motion No. 001

Page 23 of 32

23 of 32

there was a 3 mm intramedullary T-2-weighted hyperintense lesion that had not been reported in the January 26, 2017 cervical MRI report, which had been conducted several months prior to the CESI procedure. The plaintiff's expert neurologist agreed with the plaintiff's other experts that a finding of T-2-weighted hyperintensity in the spinal cord is an abnormality, "and may be seen in localized injury or inflammation in the spinal cord."

The plaintiff's neurological expert further reiterated that the plaintiff underwent an EMG/nerve conduction study on August 24, 2017 at HSS, but noted that this study was confined to the testing of the nerves in his lower extremities, and did not test the nerves emanating from the cervical spine or the spinal cord, while the September 22, 2017 surgery performed by Dr. Kornel did, in fact, involve the plaintiff's cervical spine. As the expert explained it, the nervous system consists of the peripheral nervous system, which includes the motor and sensory nerves in the arms and legs, and the central nervous system, which includes the brain and spinal cord. According to this expert, EMG/nerve conduction studies are employed to assess the peripheral nervous system and, hence, "an EMG/nerve conduction study will generally be normal when testing for the effects of spinal cord lesions or disease, since the loss of sensation that can be caused by a cervical lesion, would be caused by damage to the central nervous system (brain and spinal cord) and not the peripheral nervous system." Inasmuch as the EMG that the plaintiff underwent on August 24, 2027 did not test the central nervous system, the plaintiff's expert concluded that the test could not rule out damage caused by a lesion at the C6/C7 level of the plaintiff's spine. As the expert further explained it,

> "the August 2017 test, with respect to Anthony's lower extremities, f[ound] that peripheral neuropathy and lumbar radiculopathy are not the cause of Anthony's complaints of numbness. In ruling out the peripheral nervous system as the cause, it leaves the central nervous system, which includes the cervical spine, as the cause of Anthony's loss of sensation."

With respect to the December 12, 2017 SSEP testing that the plaintiff underwent, the plaintiff's expert neurologist explained that "stimulus preferentially excites only the largest fibers in the peripheral nerve and is predominately evaluating large fast conducting fibers," while

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.** **Page 24 of 32**
**Motion No. 001**

24 of 32

"[i]ncomplete spinal cord lesions yield varying abnormalities and may have normal SSEP. A negative or normal SSEP test does not rule out all sensory nerve damage or a lesion/ injury to the spinal cord. One can have a negative/ normal SSEP and still have an injury/lesion/contusion to his spinal cord at the cervical level that causes numbness in various parts of the body."

Since, in this case, the neurologist characterized the reported lesion as small, he or she thus concluded that "it [was] not surprising the SSEP was normal." Moreover, the expert noted that, because the SSEP testing was performed approximately seven months after the cervical lesion was found at the level of injection, and approximately three months after the plaintiff's neck surgery, it is not known what the SSEP findings may have been if the test had been administered closer in time to the diagnosis of the lesion, and before extensive neck surgery. In this respect, the expert stated that the administration of an SSEP test seven months after diagnoses, with an intervening spinal surgery, "will more likely than not alter what the testing may have shown" if it had been administered significantly earlier.

According to the expert neurologist, "[p]roper, timely and appropriate testing are only a part of the diagnosis, assessment and treatment plan for a patient with neurological complaints," while "[t]he information provided to a physician by the patient with respect to what they are medically experiencing is an integral part of treating a patient." The expert thus opined that. "with respect to diagnosis and treatment plan, a physician should not rely solely on diagnostic testing or the exam of the patient but must also consider the complaints and experiences of the patient that is reported to the physician," and suggested that Gupta's negligent failure to listen to the plaintiff's complaints and concerns, and concomitant failure to factor them into his impression, caused him to ignore or rule out a spinal cord injury at C6/C7, thus causing or contributing to the plaintiff's continued problems, including a loss of sensation from the C6/C7 level of his spine and downward into his extremities.

In reply, the defendants submitted an attorney's affirmation, in which counsel argued that the opinions of the plaintiffs' three experts were speculative, conclusory, and not supported by the relevant medical records. Counsel asserted that the only departures from good and

accepted practice that the plaintiff's experts identified was that Gupta administered a CESI to the plaintiff while the latter was asleep. She averred that the plaintiff's expert neurologist and radiologist did not identify any departures. Therefore, she argued that all claims in the bills of particulars and complaint that were not related to the May 26, 2017 injection, or which concerned any other dates on which Gupta treated the plaintiff should be dismissed. Counsel additionally argued that plaintiff's expert in pain medicine failed to refute the Dr. Gharibo's opinion that the CESI procedure was indicated, or Dr. Kaufman's opinion that the plaintiff never suffered from demyelination or transverse myelitis, should be dismissed as well.

The defendants' attorney further disparaged the expert affirmation of the plaintiff's pain management specialist as "mistakenly" claiming that

> "all of the objective measures to ensure proper needle placement[,] including Dr. Gupta's experience, technical feedback during the procedure, multiplanar fluoroscopic imaging guidance, epidurogram, loss of resistance technique and monitoring the patient's vital signs-are allegedly useless and the only way to ensure the needles are placed correctly is to rely on subjective complaints from the patient at the time."

Counsel characterized this alleged opinion by the plaintiff's expert as "self-serving and medically unsound."

The court concludes that, although the defendants made a prima facie showing of their entitlement to judgment as a matter of law in connection with the medical malpractice cause of action with their experts' affirmations, the plaintiff raised a triable issue of fact, with his experts' affirmations, as to whether Gupta departed from the applicable standard of care in administering the CESI on May 26, 2017, and in formulating a post-procedure plan of diagnosis and treatment, and that these departures caused or contributed to his claimed injuries. The court notes, however, that although it has concluded that the defendants made such a showing, they did so despite the court's skepticism that the lesion at the C6/C7 level of the plaintiff's spine was caused by anything other than the CESI procedure, or that the medical records suggested any other cause of that lesion, particularly in light of the timing of the plaintiff's complaints and the

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**
**Motion No. 001**

**Page 26 of 32**

26 of 32

[* 26]

disparities between the January 26, 2017 MRI scan, which did not show the lesion, and the May 30, 2017 MRI scan, which depicted the lesion only four days after the CESI procedure. The defendants never argued that the lesion did not exist, only that there were potential causes therefor other than Gupta's negligent failure to avoid contacting the spinal cord with a needle. While the court concludes that the defendants' experts' opinions as to these alleged possible causes bordered on the speculative, it gives the defendants' experts the benefit of the doubt, since the plaintiff did experience other traumas to his back during the relevant period of time, and the court may not assess the credibility of a witness in connection with a summary judgment motion (*see Garcia v J.C. Duggan, Inc.*, 180 AD2d at 580).

Contrary to the characterization of the defendants' counsel, the plaintiff's pain management expert did not opine that all of the alleged safety techniques employed by Gupta to assure that there was no injury to the spinal cord were "useless," only that they were less reliable because the plaintiff was asleep during the procedure and, thus, could not complain of a shock stimulus. Moreover, the court agrees with the plaintiff that he raised triable issues of fact as to whether Gupta, by failing to heed his immediate post-procedure complaints, thus failed to diagnose the plaintiff's actual condition, and negligently failed to develop or formulate an appropriate treatment protocol, thus delaying proper treatment. The defendants are correct, however, that the plaintiff failed to raise a triable issue of fact as to whether Gupta departed from good and accepted practice in administering the April 28, 2017 TFESI procedure, or on any other date on which he actually examined or provided treatment to the plaintiff. In addition, they established, prima facie, that the CESI was indicated and that the plaintiff did not sustain demyelination or transverse myelitis, and that the plaintiffs' experts, by failing to address those issues, failed to raise a triable issue of fact that the defendants committed malpractice in administering the CESI in the first instance or caused him to sustain those conditions.

Hence, that branch of the defendants' motion seeking summary judgment dismissing the medical malpractice cause of action is granted only to the extent that they are awarded

summary judgment dismissing so much of that cause of action as was premised upon the plaintiff's claims that the CESI was contraindicated, that he sustained demyelination or transverse myelitis as a consequence of the CESI, and that the defendants departed from good and accepted practice in the actual treatment of the plaintiff on dates other than May 26, 2017, and that branch of the motion is otherwise denied.

The elements of a cause of action to recover for lack of informed consent are:

"(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Hence, where a defendant establishes his or her prima facie entitlement to judgment as a matter of law in connection with a lack of informed consent cause of action by submitting an expert affirmation from a physician, a plaintiff can only raise a triable issue of fact by submitting "an expert affirmation stating with certainty that the information defendants allegedly provided to plaintiff before the [medical] procedures at issue departed from what a reasonable practitioner would have disclosed" (*Leighton v Lowenberg*, 103 AD3d 530, 530 [1st Dept 2013]).

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.** **Page 28 of 32**
**Motion No. 001**

28 of 32

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]; *see Godel v Goldstein*, 155 AD3d 939, 942 [2d Dept 2017]). Nonetheless, a defendant may satisfy his or her burden of demonstrating a prima facie entitlement to judgment as a matter of law in connection with a claim of lack of informed consent where a patient signs a detailed consent form, and there is also evidence that the necessity and benefits of the procedure, along with known risks and dangers, were discussed prior to the procedure (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

Nonetheless, "[a] failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involve[s] invasion or disruption of the integrity of the body'" (*Janeczko v Russell*, 46 AD3d 324, 325 [1st Dept 2007], quoting Public Health Law § 2805-d[2][b]; *see Lewis v Rutkovsky*, 153 AD3d at 456).

Dr. Gharibo asserted, in his affirmation, that Gupta discussed the risks and benefits of the CESI procedure with the plaintiff, as well as the alternatives thereto. He averred that the plaintiff signed a consent form reciting that "Patient understands and agrees. Injection will be scheduled at earliest convenience." Dr. Kaufman also opined that the plaintiff's lack of informed consent cause of action was without merit because, among other things, the plaintiff had submitted a referral form from his chiropractor to Gupta for pain management, which including the possibility of pain injections. Dr. Kaufman further asserted that Gupta more than adequately explained the procedure and potential risks of the procedure to plaintiff, going so far as to provide the plaintiff with a pamphlet describing the procedures and potential risks, after which the plaintiff consented to the procedures and signed two separate consent forms. Specifically, Dr. Kaufman averred that the consent form recited that the material risks were explained to the plaintiff, and noted that Gupta testified, at his deposition, that information concerning the risk of spinal cord injury and numbness, among other possible risks, was imparted to the plaintiff

452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.
Motion No. 001

Page 29 of 32

[* 29]

before the injection procedures. He further adverted to the plaintiff's deposition testimony, in which the plaintiff asserted that he signed the consent forms, thus agreeing to the injection procedures, and that the plaintiff recalled that Gupta told him about the risk of numbness from the injection procedures prior thereto. Dr. Kaufman additionally asserted that, even if Gupta did not obtain the plaintiff's fully informed consent to the procedures, such a failure did not cause or contribute to any of the plaintiff's claimed injuries.

In response to those opinions, the plaintiff's pain management expert averred that the plaintiff was "not provided with the information necessary for him to make an informed consent and the defendant's failure to provide Anthony with additional information was a proximate cause of his injury." Specifically, that expert asserted that the consent form that the plaintiff signed did not address

> "the fact that if he is put to sleep for the procedure, as opposed to being awake, or placed in proper conscious sedation, that his risk for nerve damage is exponentially greater. Nowhere in the consent or the defendant's testimony does it state that the risk of nerve damage, while awake is close to zero, but if asleep there is a risk of nerve damage. A risk that does not exist if awake or in conscious sedation.

> "Also nowhere does it state in the consent that Anthony was given the alternative to be awake."

Inasmuch as the expert noted that the plaintiff was not given the choice to remain awake during the CESI procedure, the expert concluded that that "a reasonable medical practitioner would have disclosed the alternative of being awake AND advised the patient of the exponentially greater risk of nerve damage if put in a deep sleep," and that "a reasonable patient in the same position as [the plaintiff], would have chosen to be awake or in conscious sedation so that he could communicate with the practitioner and avoid nerve injury and that Dr. Gupta did not use reasonable discretion in not advising [the plaintiff] of the same."

The court concludes that, although the defendants established their prima facie entitlement to judgment as a matter of law in connection with the lack of informed consent cause of action, the plaintiff raised a triable issue of fact in opposition thereto with the affirmation of his

**452939/2021  BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**  **Page 30 of 32**
**Motion No. 001**

30 of 32

pain management expert. Hence, that branch of the defendants' motion seeking summary judgment dismissing that cause of action must be denied.

To establish a cause of action to recover for negligent hiring, supervision, training, and retention of health-care personnel, a plaintiff must demonstrate that the defendants either "knew, or should have known," of their employees' "propensity for the sort of conduct which caused the [patient's] injury" (*Sheila C. v Povich*, 11 AD3d 120, 129-130 [1st Dept 2004]; *see Kuhfeldt v New York Presbyt./Weill Cornell Med. Ctr.*, 205 AD3d 480, 481-482 [1st Dept 2022]). Since the plaintiff adduced no facts with respect to whether the defendants knew or should have known of the propensity of their physicians' assistants, nurses, or health-care employees, other than Gupta himself, to commit acts of malpractice, that branch of the defendants' motion seeking summary judgment dismissing that cause of action must be granted.

Where a physician working for a professional corporation renders medical care to a patient "within the scope of his or her employment" for that corporation, the corporation may be held vicariously liable for the negligence of the physician (*Petruzzi v Purow*, 180 AD3d 1083, 1084-1085 [2d Dept 2020]; *Yaniv v Taub*, 256 AD2d 273, 274 [1st Dept 1998]; *Connell v Hayden*, 83 AD2d 30, 46 [2d Dept 1981]; Business Corporation Law § 1505[a][i]). Inasmuch as Gupta was the sole shareholder of the corporation, and the only physician working for the corporation who provided medical services to the plaintiff, the corporation may be held liable to the extent that Gupta is held liable. Consequently, to the extent that the plaintiff raised triable issues of fact as to Gupta's malpractice and failure to obtain the plaintiff's fully informed consent to the May 26, 2017 CESI procedure, there are triable issues of fact as to whether the corporation may be held vicariously liable for that alleged wrongdoing.

In light of the foregoing, it is,

ORDERED that the defendants' motion is granted only to the extent that they are awarded summary judgment dismissing the negligent hiring cause of action, and so much of the medical malpractice cause of action as was premised upon the plaintiff's claims that the May 26,

**452939/2021 BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.** **Page 31 of 32**
**Motion No. 001**

[* 31]

31 of 32

2017 cervical epidural steroid injection to the C6-C7 level of his spine was contraindicated, that he sustained demyelination or transverse myelitis as a consequence of any injection, and that the defendants departed from good and accepted practice in the actual treatment of the plaintiff on dates other than May 26, 2017, that cause of action and those claims are dismissed, and the motion is otherwise denied; and it is further,

ORDERED that that, on the court's own motion, the attorneys for all of the parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on May 8, 2025, at 2:30 p.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

This constitutes the Decision and Order of the court.

| 4/11/2025 | JOHN J. KELLEY, J.S.C. |
|-----------|------------------------|
| DATE      |                        |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|------------|-----------------|--------------------------|---|
| | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

**452939/2021   BIVONA, ANTHONY G. vs. GUPTA, NICKHIL D.O. GUPTA, NICKIL D.O. P.C.**          **Page 32 of 32**
**Motion No.  001**